**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| SOL IP, LLC,<br><br>Plaintiff,<br><br>v.<br><br>HONDA MOTOR CO., LTD.,<br><br>Defendant. | Case No. 2:26-cv-00764<br><br>**JURY TRIAL DEMANDED** |

## ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Sol IP, LLC ("Sol IP") files this Original Complaint for Patent Infringement under 35 U.S.C. § 271 against Defendant Honda Motor Co., Ltd. ("Honda" or "Defendant").

Plaintiff states on information and belief as follows:

## BACKGROUND

1. This action arises under the patent laws of the United States, namely 35 U.S.C. §§ 271, 281, and 284-285, among others. Defendant infringes and has infringed Sol IP's patents referenced in Counts One and Two, including U.S. Patent No. 9,900,067 (the "'067 patent") and U.S. Patent No. 10,090,894 (the "'894 patent") (collectively, "the Asserted Patents").

2. Sol IP holds an exclusive license to more than 600 patents and patent applications that are fundamental to a variety of core technologies relating to wireless telecommunications.

3. The Asserted Patents were invented by researchers at the Electronics and Telecommunications Research Institute ("ETRI").

4. ETRI is a South Korean government-funded research institution based in Daejeon, South Korea. ETRI is the national leader in South Korea in the research and development of information technologies.

5. Since its inception in 1976, ETRI has developed new technologies in 4M DRAM (dynamic random access memory), LCDs (liquid crystal displays), large-scale computer storage, CDMA (code-division multiple access) communications, 3G CDMA2000, 3G WCDMA (wideband CDMA), 4G WiBro (wireless broadband), 4G LTE (Long-Term Evolution) cellular communications, 5G NR (New Radio) cellular communications, and WLAN (wireless local area networking, or Wi-Fi).

6. ETRI employs over 2,000 research and technical staff, of whom a majority hold post-graduate degrees and approximately half have earned technological doctorate degrees. Over the last five years, ETRI has applied for nearly 14,000 patents, contributed more than 5,300 proposals adopted by various international and domestic standards organizations, and published over 1,300 articles in peer-reviewed technology publications. ETRI actively contributed to the development of advanced telecommunications platforms including 3G CDMA2000, 3G WCDMA, LTE, and 5G NR. ETRI has invested heavily into inventing standardized telecommunications technologies, supporting its thousands of research engineers and spending around $600 million annually on research and development. As a result, ETRI has developed one of the industry's strongest intellectual-property portfolios, which includes more than 21,000 patents and patent applications worldwide.

7. ETRI has a long history of innovative technical contributions, including its patents relating to LTE, LTE-Advanced, 5G NR, and Wi-Fi technology. Some of ETRI's other accomplishments include: introducing the first domestic all-digital telephone exchange in 1986,[1]

---

[1] *First Domestic Switchboard TDX*, ETRI 40TH ANNIVERSARY, https://www.etri.re.kr/40th/eng/sub04_3.html (last visited Aug. 25, 2026).

introducing one of the world's first commercial CDMA networks in 1996,[2] developing the IMT 2000 (CDMA2000) STP system in 1999,[3] introducing the world's first 4G WiBro network in 2004,[4] establishing core technology for the LTE system in 2007,[5] and developing core LTE-Advanced technology in 2010.[6]

8. Sol IP holds an exclusive license to the Asserted Patents from ETRI, which transferred to Sol IP all substantial rights in those patents.

9. Prior to filing this Complaint, Sol IP provided Defendant with notice of the Asserted Patents. For example, Sol IP sent to Catherine M. McEvilly, SVP and General Counsel of American Honda Motor Co., Inc., and Toshihiro Mibe, President of Honda Motor Co., Ltd., written communications identifying the Asserted Patents by their patent number. The communication also included details of Defendant's infringement of the Asserted Patents.

10. Sol IP brings this lawsuit against Honda seeking this Court's protection of its valuable intellectual property rights.

11. Sol IP does not accuse of infringement in this case any products to the extent their relevant Wi-Fi functionality is implemented using Wi-Fi devices, modules, chipsets, or other

---

[2] *World's First Commercialization of CDMA*, ETRI 40TH ANNIVERSARY, https://www.etri.re.kr/40th/eng/sub04_8.html (last visited Aug. 25, 2026).

[3] *WCDMA: Third Generation Mobile Communications Technology*, ETRI 40TH ANNIVERSARY, https://www.etri.re.kr/40th/eng/sub04_11.html (last visited Aug. 25, 2026); *Overview*, ETRI, https://www.etri.re.kr/engcon/sub1/sub1_02.etri (last visited Aug. 25, 2026).

[4] *Mobile Internet System and Standard WiBro*, ETRI 40TH ANNIVERSARY, https://www.etri.re.kr/40th/eng/sub04_20.html (last visited Aug. 25, 2026).

[5] *LTE-Advanced Mobile Telecommunication System*, ETRI 40TH ANNIVERSARY, https://www.etri.re.kr/40th/eng/sub04_31.html (last visited Aug. 25, 2026); *Overview*, ETRI, https://www.etri.re.kr/engcon/sub1/sub1_02.etri (last visited Aug. 25, 2026).

[6] *LTE-Advanced Mobile Telecommunication System*, ETRI 40TH ANNIVERSARY, https://www.etri.re.kr/40th/eng/sub04_31.html (last visited Aug. 25, 2026); *Overview*, ETRI, https://www.etri.re.kr/engcon/sub1/sub1_02.etri (last visited Aug. 25, 2026).

components made, supplied, or sold by either LG Electronics Inc. and its subsidiaries or Samsung Electronics Co., Ltd. and its subsidiaries.

## PARTIES

12. Sol IP realleges and incorporates each of preceding paragraphs.

13. Sol IP is an intellectual-property licensing company organized and existing as a limited liability company under the laws of Virginia with a principal place of business at 8287 Spring Leaf Court, Vienna, Virginia 22182.

14. On information and belief, Defendant Honda Motor Co., Ltd. is a corporation organized and existing under the laws of Japan with a principal place of business at TORANOMON ALCEA TOWER 2-2-3 Toranomon, Minato-ku, Tokyo 105-8404, Japan.

15. On information and belief, Defendant conducts business, either directly or through one or more of its subsidiaries, agents, affiliates, and/or intermediaries, in this judicial district and elsewhere in the United States, including, without limitation, making, using, offering to sell, selling, and/or importing products containing integrated wireless communications devices that embody the patented technology of the Asserted Patents, and enabling end-user purchasers to use such connected vehicles throughout the United States, including this judicial district.

16. On information and belief, Defendant controls (and has controlled) American Honda Motor Company, which is a wholly-owned subsidiary of Defendant. On information and belief, American Honda Motor Company is wholly controlled by Defendant and/or an agent of Defendant. On information and belief, Defendant established American Honda Motor Company for the purpose of strategic brand and customer development in the United States and to provide services, distribution, and sales to U.S. customers.

17. Honda and its U.S. subsidiary, American Honda Motor Company (and their subsidiaries, affiliates and/or intermediaries) form an interrelated group of companies doing

business as a collective whole under the Honda brand, which together "ha[ve] become an American leader in mobility."[7] Honda and American Honda Motor Company are part of the same corporate structure and distribution chain for the making, using, selling, offering for sale, and/or importing the Accused Instrumentalities (as defined *infra*) in the United States, including in Texas generally and this District in particular. On information and belief, Honda and American Honda Motor Company (and their subsidiaries, affiliates and/or intermediaries) share the same management, common ownership, advertising platforms, facilities, distribution chains and platforms, and accused technologies. Thus, Honda and American Honda Motor Company (and their subsidiaries, affiliates and/or intermediaries) operate as a unitary business and Honda is vicariously liable for the acts of patent infringement alleged herein.

18. Honda, including its respective U.S. and foreign-based employees, agents, distributors, affiliates, business partners, retail partners, and customers (which act as part of a global network and supply chain of overseas sales and manufacturing subsidiaries), have operated as agents of one another and vicariously as parts of the same business group, working in concert together and entering into agreements that are nearer than arm's length. Honda and its U.S. and foreign-based employees, agents, distributors, affiliates, business partners, retail partners, and/or customers, individually and/or in concert, conduct business (and have conducted business) in the United States, including importing, shipping, distributing, offering to sell, and selling Accused Instrumentalities (as defined *infra*) that incorporate devices, systems, and processes that infringe the Asserted Patents in Texas and this District. *See Trois v. Apple Tree Auction Center, Inc.*, 882 F.3d 485, 490 (5th Cir. 2018) ("A defendant may be subject to personal jurisdiction because of the activities of its agent within the forum state . . . ."); *see also Cephalon, Inc. v. Watson*

[7] https://www.honda.com/heritage-center (last visited Aug. 25, 2026).

*Pharmaceuticals, Inc.*, 629 F. Supp. 2d 338, 348 (D. Del. 2009) ("The agency theory may be applied not only to parents and subsidiaries, but also to companies that are 'two arms of the same business group,' operate in concert with each other, and enter into agreements with each other that are nearer than arm's length.").

19. Many products accused of infringement (e.g., 2024 Civic Type R) show that the vehicle was manufactured by Defendant and bear U.S. vehicle certification label(s) that the vehicles conform to applicable U.S. federal motor vehicle safety standards and/or U.S. EPA standards. These labels demonstrate that Defendant manufactured infringing products for sale and use in the United States and participated in, directed, or caused its importation and placement into U.S. commerce.







https://bringatrailer.com/listing/2024-honda-civic-type-r/ (last visited Aug. 26, 2026).

20. Through importation, manufacture, offers to sell, sales, distributions, and/or related agreements to transfer ownership of Defendant's infringing products with subsidiaries, distributors, and/or customers operating in and maintaining significant business presences in the United States, this State, and this District, Defendant does extensive business in the United States, this State, and this District.

21. Defendant operates (and has operated) in agency with its respective foreign and U.S.-based subsidiaries, affiliates, distributors, retail partners, suppliers, and customers, to provide a distribution channel of infringing products within this District and the U.S. nationally. Defendant and/or its respective agents and foreign and U.S.-based subsidiaries, affiliates, distributors, retail partners, suppliers, and customers, purposefully direct (and have directed) the infringing products into established distribution channels within this District and the U.S. nationally.

22. On information and belief, Defendant, including its respective U.S. and foreign-based subsidiaries, employees, agents, distributors, affiliates, business partners, retail partners, and customers (which act as part of a global network and supply chain of overseas sales and manufacturing subsidiaries), have operated as agents of one another and vicariously as parts of the same business group, working in concert together and entering into agreements that are nearer than arm's length. Defendant and its U.S. and foreign-based subsidiaries, employees, agents, distributors, affiliates, business partners, retail partners, and/or customers, individually and/or in concert, conduct business (and have conducted business) in the United States, including importing, shipping, distributing, offering to sell, and selling the infringing products that incorporate devices, systems, and processes that infringed the Asserted Patents in Texas and this District.

23. Defendant and its subsidiaries operate through coordinated management, common ownership, common Honda and Acura-branded advertising and customer-support platforms,

integrated U.S. facilities, common distribution chains and dealer/financing platforms, and overlapping Honda and Acura-branded infringing product lines and products involving related technologies. On information and belief, Defendant operates (and has operated) as a single business entity and/or in concert with its affiliates, distributors, subsidiaries, suppliers, retail partners, customers, and/or agents to manufacture, sell, offer to sell, import, market, advertise, and/or otherwise promote the infringing products in the United States, including in the State of Texas generally and this District in particular.

24. On information and belief, Defendant and its subsidiaries operate as a unitary business venture and are jointly and severally liable for the acts of patent infringement alleged herein. On information and belief, Defendant and its subsidiaries operate as an integrated Defendant business enterprise with respect to the infringing products, and Defendant is liable for the infringing acts alleged herein directly, vicariously, and/or through agency and alter-ego principles.

25. Through offers to sell, sales, imports, distributions, and other related agreements to transfer ownership of Defendant's infringing products by and/or to affiliates, distributors, subsidiaries, suppliers, business partners, retail partners, customers, and/or agents, Defendant is operating in (and has operated in) and maintaining (and has maintained) a significant business presence in the U.S. and, through its U.S. subsidiaries or agents, Defendant has done (and does) business in the U.S., the state of Texas, and in this District.

## **JURISDICTION AND VENUE**

26. Sol IP realleges and incorporates each of preceding paragraphs.

27. This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq*., including, without limitation, 35 U.S.C. §§ 271, 281, 284, and 285. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

28. This Court has specific and general personal jurisdiction over Defendant consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long Arm Statute because, among other things, Defendant has engaged in continuous, systematic, and substantial business in Texas and has committed and continues to commit, directly or through intermediaries (including subsidiaries, agents, distributors, affiliates, retailers, suppliers, integrators, customers, and others), acts of patent infringement in this State and this District. Such acts of infringement include making, using, testing, offering for sale, selling, and/or importing the Accused Instrumentalities (as more particularly identified and described throughout this Complaint) in this State and this District and/or inducing others to commit acts of patent infringement in this State and District. Indeed, Defendant has purposefully and voluntarily placed, and is continuing to place, one or more infringing products into the stream of commerce through established distribution channels with the expectation and intent that such products will be sold to and purchased by consumers in the United States, this State, and this District; and with the knowledge and expectation that such products (whether in standalone form or as integrated in downstream products) will be imported into the United States, this State, and this District.

29. Upon information and belief, Defendant compensates its U.S.-based subsidiaries and/or agents for their sales and/or support services in the United States. As such, Defendant has a direct financial interest in its U.S.-based subsidiaries and/or agents, and/or partners, distributors, or customers, and vice versa.

30. In addition, Defendant has derived substantial revenues from its infringing acts occurring within this State and this District. Defendant has substantial business in this State and this District, including (i) at least part of its infringing activities alleged herein and (ii) regularly doing or soliciting business, engaging in other persistent conduct, and/or deriving substantial

revenue from infringing goods offered for sale, sold, and imported, and services provided to Texas residents vicariously through and/or in concert with its agents, intermediaries, distributors, importers, customers, subsidiaries, and/or consumers.

31. On information and belief, Defendant controls (or has controlled) or otherwise directs (or has directed) and authorizes (or has authorized) all activities of its U.S.-based (or foreign-based with the knowledge that infringing products are directed to the United States and this District) agents and/or sales and/or distribution subsidiaries. Such directed and authorized activities include the U.S.-based (and/or foreign-based) subsidiaries' and/or agents having used, offered for sale, sold, and/or imported Accused Instrumentalities, their components, processes, and/or products containing the same that incorporated the fundamental technologies and claims of the Asserted Patents. Defendant's U.S.-based (and/or foreign-based) sales and/or distribution subsidiaries and/or agents were authorized to import, distribute, sell, or offer for sale Accused Instrumentalities on behalf of Defendant. For example, Defendant researched, designed, developed, and manufactured infringing products, and then directed its U.S.-based (and/or foreign-based) sales subsidiaries, distributors, business partners, agents, and/or others to import, distribute, offer for sale, and sell infringing products in the United States. *See, e.g.*, *Am. Patents LLC v. D-Link Corp.*, Civil Action No. 4:19-cv-764, 2020 U.S. Dist. LEXIS 123158, at 15* (E.D. Tex. July 14, 2020) ("It is enough, for a prima facie case, that [defendant] appears to have had a role in orchestrating—through its wholly owned subsidiary—the accused products' *placement* in the stream of commerce.") (emphasis in original); *see also United States v. Hui Hsiung*, 778 F.3d 738, 743 (9th Cir. 2015) (finding that the sale of infringing products to third parties rather than for direct import into the U.S. did not "place [defendants'] conduct beyond the reach of United States law [or allow them to] escape culpability under the rubric of extraterritoriality"). Thus, Defendant

conducted infringing activities, and Defendant's U.S.-based (and foreign-based) sales subsidiaries and/or distributors and/or agents and/or business partners conducted infringing activities on behalf of Defendant.

32. On information and belief, Defendant's U.S.-based (and/or foreign-based) sales and/or distribution subsidiaries' and/or agents' presence (including in the past) in the United States gave Defendant substantially the same business advantages that it would have enjoyed if Defendant conducted its business through its own offices or paid agents. Defendant's U.S.-based (and/or foreign-based) sales subsidiaries and/or distributors and/or agents were authorized to import, distribute, sell, and offer for sale Defendant's products, including the Accused Instrumentalities, as well as their components and processes related to the same, on behalf of Defendant. For example, Defendant's U.S.-based (and/or foreign-based) sales subsidiaries and/or agents operated within Defendant's global network and supply chain of sales. In the U.S., including within the Eastern District of Texas, the Accused Instrumentalities, as well as their components and processes related to the same, were imported, distributed, offered for sale, and/or sold.

33. Via Defendant's alter egos, agents, business partners, intermediaries, distributors, importers, customers, subsidiaries, and/or consumers that maintained a business presence, operated in, and/or resided in the U.S., Defendant's products, including products and processes accused of infringing the Asserted Patents, are or have been widely distributed and sold in Texas including within this District. *See Litecubes, LLC v. Northern Light Products, Inc.*, 523 F.3d 1353, 1369-70 (Fed. Cir. 2008) ("[T]he sale [for purposes of § 271] occurred at the location of the buyer."); *see also Semcon IP Inc. v. Kyocera Corp.*, No. 2:18-CV-00197-JRG, 2019 U.S. Dist. LEXIS 74904, at 6-8* (E.D. Tex. May 3, 2019) (denying accused infringer's motion to dismiss

because plaintiff sufficiently pleaded that purchases of infringing products outside of the United States for importation into and sales to customers in the U.S. may constitute a sale or an offer to sell under § 271(a)).

34. On information and belief, Defendant has placed infringing products and/or products that practiced infringing processes into the stream of commerce via established distribution channels comprising at least its subsidiaries, business partners, affiliates, distributors, and/or agents or customers, with the knowledge and/or intent that those products were imported, used, offered for sale, and sold in the United States and Texas, including in this District. As a result, Defendant has, vicariously through and/or in concert with alter egos, agents, intermediaries, distributors, affiliates, importers, customers, subsidiaries, and/or consumers, placed infringing products into the stream of commerce via established distribution channels with the knowledge and/or intent that those products were sold and continue to be sold in the United States and Texas, including in this District.

35. The minimum contacts test is satisfied because Defendant delivers its products (e.g., Honda and Acura-branded vehicles) into the stream of commerce with the expectation that they will be purchased by consumers in Texas. *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1566 (Fed. Cir. 1994) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 100 S. Ct. 559 (1980)); *see also Universal Connectivity Techs. Inc. v. Lenovo Grp. Ltd.*, No. 2:23-CV-00449-JRG, 2024 U.S. Dist. LEXIS 189038, at *8-9 (E.D. Tex. Oct. 16, 2024). For example, and on information and belief (and as provided for herein), Defendant imports, and/or has imported and/or shipped infringing products into the United States through and with its supply chain partners and/or agents, including, but not limited to, Defendant's subsidiaries and/or affiliates and/or agents, such as American Honda Motor Company. Defendant supplies infringing products (e.g.,

Honda and Acura-branded vehicles) to its customers, subsidiaries, affiliates, agents, and/or distributors knowing that its products accused of infringement are offered for sale, sold, imported, and/or used by Defendant, its customers, subsidiaries, affiliates, and/or agents in the United States and this District. Products accused of infringement were (and are) directed to this District and were (and are) available for purchase in this District via dealerships. The lengthy and complex distribution chain does not insulate Defendant from suit in Texas.

36. Defendant intentionally placed its Honda and Acura-branded vehicles in a distribution chain flowing from Asia to the United States, Texas, and this District. For example, Defendant intentionally places Honda and Acura-branded vehicles in a distribution or supply chain knowing that such Honda and Acura-branded vehicles ultimately arrive in the United States market and this District through, at least, its direct and indirect customers such as dealerships. Defendant, through its sales of Honda and Acura-branded vehicles downstream knew (or should have reasonably known) the likely destination of the products, where Defendant's conduct and connections with Texas and this District were such that Defendant should have reasonably anticipated being brought to court in this District. Indeed, vehicles manufactured by Defendant include a statement that the vehicles conform to applicable federal motor vehicle safety standards and/or EPA standards indicating compliance with the laws and regulations of the United States, further evidencing that Defendant knew or should have known that its products were destined for the United States and this District.

37. Defendant, including through its U.S.-based subsidiaries, has and had commercial relationships with a significant number of dealerships, and Defendant accesses the Texas vehicle market vis-à-vis these relationships. Given Defendant's relationship with such dealerships, jurisdiction in this Court is fair and reasonable. Through American Honda Motor Company,

authorized Honda dealerships, and/or authorized Acura dealerships, Defendant facilitates the offer for sale, sale, distribution, and use of Accused Instrumentalities in the United States, Texas, and this District. For example, Tower Honda of Longview is an authorized Honda dealership located in this District at 600 E Loop 281, Longview, Texas 75605.

38. Also by way of example, and on information and belief, Defendant has (and has had) U.S.-based (and/or foreign-based) employees that work in connection with the infringing products.

39. In addition, Defendant, directly or through its wholly owned subsidiaries, has knowingly induced, and continues to knowingly induce, infringements within this State and this District by advertising, marketing, offering for sale and/or selling Accused Instrumentalities (as more particularly identified and described throughout this Complaint) that incorporate the fundamental technologies covered by the Asserted Patents. Such advertising, marketing, offering for sale and/or selling of infringing products is directed to consumers, customers, manufacturers, integrators, suppliers, distributors, resellers, partners, and/or end users, and this includes providing instructions, user manuals, advertising, and/or marketing materials that facilitate, direct and encourage use of infringing functionality with Defendant's knowledge thereof.

40. Defendant has, in the multitude of ways described above, availed itself of the benefits and privileges of conducting business in this State and willingly subjected itself to the exercise of this Court's personal jurisdiction over it. Defendant also has sufficient minimum contacts with this forum through its transaction of substantial business in this State and this District and its commission of acts of patent infringement as alleged in this Complaint that are purposefully directed towards this State and District.

41. Venue is proper in this District under 28 U.S.C. § 1391 because, among other things, Defendant is a foreign corporation and thus may be sued in any judicial district pursuant to 28 U.S.C. § 1391(c)(3).

## ACCUSED STANDARDS AND INSTRUMENTALITIES

42. Sol IP realleges and incorporates each of preceding paragraphs.

43. The Institute of Electrical and Electronics Engineers ("IEEE") is a technical professional organization that develops "industry standards in a broad range of technologies," including the IEEE 802.11 family of standards for wireless local area networks, also branded as Wi-Fi.[8] The IEEE has issued numerous releases of the IEEE 802.11 standard, including the original IEEE 802.11 in 1997, IEEE 802.11a and 802.11b in 1999, IEEE 802.11g in 2003, IEEE 802.11n in 2009, and IEEE 802.11ac in 2013. Devices that support the 802.11ac standard are also known as Wi-Fi 5 devices. Features of IEEE 802.11ac are encompassed in the IEEE 802.11-2016 specification cited below. Subsequent versions of the IEEE 802.11 standard, including at least IEEE 802.11ax and IEEE 802.11be, are backwards compatible with IEEE 802.11ac and incorporate the features of 802.11ac. As used herein, IEEE 802.11ac includes IEEE 802.11ac as well as any subsequent IEEE 802.11 standards, such as IEEE 802.11ax and IEEE 802.11be, that incorporate features of IEEE 802.11ac.

44. Defendant makes, uses, sells, offers for sale and/or imports into the United States vehicles and devices configured with Wi-Fi functionality that comply with IEEE 802.11ac.

45. By way of example, on information and belief, Defendant's products that are configured with Wireless Apple CarPlay and/or Wireless Android Auto are compliant with IEEE

---

[8] *IEEE Standards*, IEEE, https://www.ieee.org/standards/index.html (last visited Aug. 25, 2026); *accord About IEEE P802.11 and How to Participate*, IEEE 802 LAN/MAN STANDARDS COMMITTEE, https://www.ieee802.org/11/abt80211.html (last visited Aug. 25, 2026); *Discover Wi-Fi*, WI-FI ALLIANCE, https://www.wi-fi.org/discover-wi-fi (last visited Aug. 25, 2026).

802.11ac. On information and belief, the components of Defendant's products associated with Wireless Apple CarPlay and/or Wireless Android Auto are compliant with IEEE 802.11ac.

46. By way of another example, on information and belief, Defendant's products that are configured with Wi-Fi hotspot functionality are compliant with IEEE 802.11ac. On information and belief, the components of Defendant's products associated with Wi-Fi hotspot functionality are compliant with IEEE 802.11ac.

47. By way of another example, on information and belief, Defendant's products that are configured to receive over-the-air updates via Wi-Fi are compliant with IEEE 802.11ac. On information and belief, the components of Defendant's products associated with over-the-air updates via Wi-Fi are compliant with IEEE 802.11ac.

48. In another example, on information and belief, Defendant's products that are configured with HondaLink® are compliant with IEEE 802.11ac. For example, Defendant states that "HondaLink® connects you to the latest information from Honda. You can connect your phone wirelessly through Wi-Fi . . . ."[9] Defendant's webpage demonstrates that vehicles equipped with HondaLink include a touchscreen that indicates when the vehicle is connected via Wi-Fi.[10] On information and belief, many of the products, if not all of the products, accused of infringement are operable with Defendant's HondaLink mobile application ("Defendant's Mobile App").[11] Defendant's Mobile App works in conjunction with the HondaLink system to provide users the

[9] https://owners.honda.com/utility/download?path=/static/pdfs/2021/Insight/2021_Insight_HondaLink.pdf (last visited Aug. 25, 2026); *see also* https://techinfo.honda.com/rjanisis/pubs/om/ah/at902626iom/enu/details/131293047-733995.html (last visited Aug. 25, 2026); https://mygarage.honda.com/s/article/HondaLink-Over-the-Air-Software-Update-for-Wireless-Network-Upgrade? (last visited Aug. 25, 2026).

[10] https://automobiles.honda.com/cr-v#technology (last visited Aug. 25, 2026).

[11] *Id.*

ability to remotely control their vehicles, for example, to remotely start their vehicle, locate their vehicle, and lock or unlock their vehicle.[12]

49. In another example, Defendant has certified that its products "Display Audio-HM CDC" having model number AH00CDC and "Car Navigation System-HM ICB" having model number AH00ICB are each compliant with IEEE 802.11ac:

**Certification ID: WFA115172**

**Date of Last Certification:** Mar 25, 2026
**Brand:** Honda Motor Co., Ltd.
**Category:** Other
**Sub-category:** Navigation/GPS
**Product Name:** Car Navigation System-HM ICB
**Model Number:** AH00ICB
**Total Variants:** 5

**Variant #1 of 5 matches**

**Date of Certification:** Mar 25, 2026
**Product Model Variant:** Variant model_Android15_with Passpoint,WPA2/WPA3 Enterprise
**Operating System:** Android 15; Android 15
**Frequency Band(s):** 2.4 GHz; 5 GHz

**Summary of Certifications for Variant #1**

| CLASSIFICATION | PROGRAM |
|---|---|
| Access | Passpoint® |
| Security | Protected Management Frames |
| | WPA2™-Enterprise |
| | WPA2™-Personal |
| | WPA3™-Enterprise |
| | WPA3™-Personal |
| Wi-Fi (MAC/PHY) | Spectrum & Regulatory |
| | Wi-Fi CERTIFIED™ ac |

**Certification ID: WFA131149**

**Date of Last Certification:** May 21, 2026
**Brand:** Honda Motor Co., Ltd.
**Category:** Other
**Sub-category:** Navigation/GPS
**Product Name:** Display Audio-HM CDC
**Model Number:** AH00CDC
**Total Variants:** 2

**Variant #1 of 2 matches**

**Date of Certification:** May 21, 2026
**Product Model Variant:** Variant model_Android15
**Operating System:** Android 15; Android 15
**Frequency Band(s):** 2.4 GHz; 5 GHz; 6 GHz

**Summary of Certifications for Variant #1**

| CLASSIFICATION | PROGRAM |
|---|---|
| Access | Passpoint® |
| Security | Protected Management Frames |
| | Wi-Fi Enhanced Open™ |
| | WPA2™-Enterprise |
| | WPA2™-Personal |
| | WPA3™-Enterprise |
| | WPA3™-Personal |
| Wi-Fi (MAC/PHY) | Spectrum & Regulatory |
| | Wi-Fi CERTIFIED 6® |
| | Wi-Fi CERTIFIED™ ac |

https://www.wi-fi.org/product-finder?keywords=honda (last visited Aug. 26, 2026).

50. "Accused Instrumentalities" refer to any Honda product (e.g., Honda or Acura branded vehicles, Honda infotainment units, etc.) that are compliant with IEEE 802.11ac, as well as their components (e.g., hardware, software, and/or firmware), and processes related to the same. At a minimum, the Accused Instrumentalities comprise the HR-V (e.g., LX, Sport, EX-L), CR-V (e.g., LX, EX, EX-L, Sport Hybrid, TrailSport Hybrid, Sport-L Hybrid), CR-V e:FCEV, Prologue

[12] *Id.*

(e.g., EX, Touring, Elite), Pilot (e.g., Sport, EX-L, TrailSport, Touring, Touring Blackout, Elite), Passport (e.g., ETL, RTL Towing, RTL Blackout, TrailSport, TrailSport Blackout, TrailSport Elite), Civic Sedan (e.g., Sport Touring Hybrid), Accord (e.g., LX, SE, Sport Hybrid, EX-L Hybrid, Sport-L Hybrid, Touring Hybrid), Civic Si Sedan, Civic Hatchback (e.g., Sport Touring Hybrid), Prelude Hybrid (e.g., Hybrid, Hybrid Two-Tone), Civic Type R, Ridgeline (e.g., Sport, RTL, TrailSport, TrailSport+HPW Wheels, Black Edition, Black Edition Two-Tone), Odyssey (e.g., EX-L, Sport-L, Touring, Elite), Display Audio-HM CDC (e.g., model no. AH00CDC), Car Navigation System-HM ICB (e.g., model no. AH00ICB), and any products comprising the Display Audio-HM CDC (e.g., model no. AH00CDC) and/or Car Navigation System-HM ICB (e.g., model no. AH00ICB). Notwithstanding the foregoing, Accused Instrumentalities do not include any products to the extent their relevant Wi-Fi functionality is implemented using Wi-Fi devices, modules, chipsets, or other components made, supplied, or sold by either LG Electronics Inc. and its subsidiaries or Samsung Electronics Co., Ltd. and its subsidiaries.

## NOTICE OF THE ASSERTED PATENTS

51. Sol IP realleges and incorporates each of preceding paragraphs.

52. At least as early as June 7, 2021, Defendant was on notice of Sol IP's patent portfolio, including the Asserted Patents, when Sol IP sent Defendant two letters (the "Notice Letters") via FedEx, one addressed to Catherine M. McEvilly, SVP and General Counsel of American Honda Motor Co., Inc., and one addressed to Toshihiro Mibe, President of Honda Motor Co., Ltd. The Notice Letter addressed to Toshihiro Mibe was also sent to Catherine M. McEvilly and the General Counsel of Acura. The Notice Letters provided a list of Sol IP's Wi-Fi Patents, including the '067 patent and the '894 patent.

53. Each of the Notice Letters explained that "Wi-Fi" means wireless networking technologies that adhere to the technological requirements stated in the 802.11 standards published

by IEEE, including 802.11ac. Each of the Notice Letters stated: "We also believe that all Wi-Fi-capable Products - including any products equipped with a built-in Wi-Fi hotspot - made, used, offered for sale, sold, or imported by your company infringe at least one or more of the claims of each of Sol IP's Wi-Fi Patents listed in the Attachment." An attachment to the Notice Letters lists, among others, the patents referenced in this Complaint by patent number. Each of the Notice Letters also stated: "By way of example, we believe that all of your company's Wi-Fi-capable Products infringe at least one or more claims of the following patents and their patent family members: . . . 9,900,067 . . . [and] 10,090,894 . . . [where] [e]xamples of such infringing products include Honda Accord, Honda Insight, Honda Odyssey, Honda Passport, Honda Pilot, Acura RDX, and Acura TLX." Each of the Notice Letters further stated that Sol IP "hereby offer[s] a license under . . . Sol IP's Wi-Fi Patents on fair, reasonable, and non-discriminatory terms, and are willing to negotiate the details with your company."

54. At a minimum, Defendant has known of the Asserted Patents and its infringement of the Asserted Patents at least as early as the filing date and/or service date of the Original Complaint.

55. To the extent any marking or notice was required by 35 U.S.C. § 287, Sol IP has complied with the applicable marking and/or notice requirements of 35 U.S.C. § 287. For example, as discussed herein, Defendant was previously put on notice of its infringement of the Asserted Patents via June 7, 2021 letters from Sol IP. Further, by virtue of service of this Complaint, Defendant is on notice of the Asserted Patents, to the extent it was not already on notice.

## COUNT ONE
## INFRINGEMENT OF U.S. PATENT NO. 9,900,067

56. Sol IP realleges and incorporates each of preceding paragraphs.

57. On February 20, 2018, the United States Patent and Trademark Office duly and legally issued the '067 Patent, titled "Method And Apparatus For Transmitting And Receiving Data In A Mimo System." A true and correct copy of the '067 patent is attached as Exhibit 1.

58. Sol IP is the exclusive licensee of the '067 patent and holds all substantial rights to that patent, including the sole right to sue and recover for any and all infringements.

59. The '067 patent is valid and enforceable.

60. Defendant directly infringes one or more claims of the '067 patent in this District and elsewhere in Texas and the United States.

61. Defendant directly infringes, either by itself or via its agent(s), alter egos, intermediaries, distributors, importers, and/or subsidiaries, at least claim 38 of the '067 patent as set forth under 35 U.S.C. § 271(a) by making, using, selling, offering to sell, and/or importing the Accused Instrumentalities.

62. On information and belief, Defendant sold and made some Accused Instrumentalities outside of the United States, delivered those products to its customers, agents, intermediaries, distributors, importers, and/or subsidiaries in the United States, or in the case that it delivered the Accused Instrumentalities outside of the United States, it did so intending and/or knowing that those products were destined for the United States and/or designed those products for sale in the United States, thereby directly infringing the '067 patent. *See, e.g.*, *Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013); *see also Semcon IP Inc. v. Kyocera Corp.*, No. 2:18-CV-00197-JRG, 2019 U.S. Dist. LEXIS 74904, at *6-8 (E.D. Tex. May 3, 2019). Furthermore, Defendant directly infringed the '067 patent through its direct involvement in the activities of its subsidiaries including by selling and offering for sale the Accused Instrumentalities directly to such subsidiaries and importing the

Accused Instrumentalities into the United States for such subsidiaries. Such subsidiaries conduct activities that constitute direct infringement of the ’067 patent under 35 U.S.C. § 271(a) by having made, used, tested, offered for sale, sold, and/or imported those Accused Instrumentalities. On information and belief, Defendant offered for sale, sold, and imported the Accused Products within the U.S. to, for example, its distributors, customers, subsidiaries, importers, and/or consumers. Further, Defendant is vicariously liable for this infringing conduct of its U.S.-based subsidiaries, (under both the alter ego and agency theories) because, as an example and on information and belief, Defendant and its subsidiaries are essentially the same company, and Defendant has the right and ability to control its subsidiaries infringing acts and receives a direct financial benefit from the infringement of its U.S.-based subsidiaries.

63. The preamble of claim 38 of the ’067 patent recites “[a] communication device.” To the extent the preamble limits the claim, each Accused Instrumentality is a communication device.

64. Claim 38 of the ’067 patent recites “a processor.” Each Accused Instrumentality includes one or more processors.

65. Claim 38 of the ’067 patent recites “a memory operably coupled with the processor and storing program instructions.” Each Accused Instrumentality includes one or more memories that are operably coupled with the one or more processors and store program instructions that, when executed by the one or more processors, cause the communication device to implement at least the mandatory features of IEEE 802.11ac referenced in this Count.

66. Claim 38 of the ’067 patent recites that the program instructions, when executed by the processor, cause the communication device to “transmit a first control field over a first frequency band, a bandwidth of the first frequency band being a multiple of 20 MHz.” As recited

in claim 38 of the ’067 patent and in accordance with at least IEEE 802.11ac, Sections 21.1.1 and 21.3.19, each Accused Instrumentality includes program instructions that, when executed by one or more processors, cause the communication device to transmit a very high-throughput signal A (VHT-SIG A) field over a frequency band of 20 MHz, 40 MHz, 80 MHz, 160 MHz, or 80+80 MHz. *See, e.g.*, IEEE 802.11-2016 §§ 21.1.1, 21.3.19, Figures 21-4, 21-34, Table 21-4.

67. Claim 38 of the ’067 patent recites that the program instructions, when executed by the processor, cause the communication device to “transmit a second control field over the first frequency band, wherein the second control field comprises a first indicator indicating a length of subsequent user data, a reserved bit portion subsequent to the first indicator and a tail bit portion subsequent to the reserved bit portion, and wherein a number of bits comprising the first indicator when the first frequency band is 40 MHz is smaller than a number of bits comprising the first indicator when the first frequency band is larger than 40 MHz.” As recited in claim 38 of the ’067 patent and in accordance with at least IEEE 802.11ac, Sections 21.1.1, 21.3.19, and 21.3.8.3.6, each Accused Instrumentality includes program instructions that, when executed by one or more processors, cause the communication device to transmit a very high-throughput signal B (VHT-SIG B) field over the same frequency band that the VHT-SIG A field was transmitted over. *See, e.g.*, IEEE 802.11-2016 §§ 21.1.1, 21.3.8, 21.3.19, Figures 21-4, 21-34, Table 21-4. As recited in claim 38 of the ’067 patent and in accordance with at least IEEE 802.11ac, Sections 21.3.8.3.6 and 21.4.3, the VHT-SIG B field comprises a VHT-SIG B length field, a reserved field after the VHT-SIG B length field, and a tail field after the reserved field. *See, e.g.*, IEEE 802.11-2016 §§ 21.3.8, 21.4.3, Figures 21-22, 9-741, Table 21-14. As recited in claim 38 of the ’067 patent and in accordance with at least IEEE 802.11ac, Section 21.3.8.3.6, the VHT-SIG B length field has fewer

bits when the frequency band is 40 MHz than when the frequency band is larger than 40 MHz. *See, e.g.*, IEEE 802.11-2016 § 21.3.8, Figures 21-22, 9-741, Table 21-14.

68. Defendant has indirectly infringed and continues to indirectly infringe at least claim 38 of the ’067 patent under 35 U.S.C. § 271(b), either literally and/or under the doctrine of equivalents, by actively inducing others, including OEMs, agent-subsidiaries, affiliates, partners, software and hardware providers, manufacturers, system integrators, distributors, importers, resellers, customers, end users, and/or other third parties, in this District and elsewhere in the United States, to directly infringe the ’067 patent.

69. Defendant indirectly infringes by inducing third parties (e.g., end users) to infringe at least claim 38 of the ’067 patent by using the Wi-Fi capabilities of the Accused Instrumentalities in their normal and customary way (e.g., activating the Wi-Fi hotspot, connecting Wireless Apple CarPlay and/or Wireless Android Auto, over-the-air system updates via Wi-Fi) in the United States and in this District. Defendant also indirectly infringes by inducing third parties (e.g., dealerships, to the extent they are not deemed to be Defendant’s agents) to infringe at least claim 38 of the ’067 patent by offering for sale and selling the Accused Instrumentalities. For example, Defendant actively induces third parties, including without limitation end-users of the Accused Instrumentalities and dealerships (to the extent not agents of Defendant) that sell and offer to sell the Accused Instrumentalities, to infringe the ’067 patent by, among other things, (i) designing, manufacturing, offering for sale, selling, or otherwise providing the Accused Instrumentalities to third parties (e.g., dealerships, to the extent they are not deemed to be Defendant’s agents) with the knowledge and intent that the third parties will sell the Accused Instrumentalities to end users; (ii) designing and manufacturing the Accused Instrumentalities with the knowledge and intent that end-users will use the Wi-Fi capabilities of such devices in accordance with IEEE 802.11ac; (iii)

enabling end-users of Accused Instrumentalities to use the devices in accordance with at least IEEE 802.11ac; (iv) providing instructions to end-users for using the Accused Instrumentalities in their customary way, including instructions on using the Wi-Fi connectivity features of the devices; (v) enabling users to monitor and control their Accused Instrumentalities using Defendant's Mobile App; and (vi) providing to third parties the hardware components (e.g., antenna(s), filter(s), switch(es), transceiver(s), and/or baseband processor(s) contained in Accused Instrumentalities) and software components (e.g., operating systems running on Accused Instrumentalities and other software and/or firmware used to operate components of the Accused Instrumentalities) that may be required for or associated with infringement of the '067 patent.

70. Defendant encourages end-users and dealerships to infringe at least claim 38 of the '067 patent with knowledge and the specific intent to cause the acts of direct infringement performed by these third parties. On information and belief, despite having knowledge of the '067 patent at least as early as the receipt of the Notice Letters, Defendant has engaged and continues to engage in activities constituting inducement of such direct infringement, notwithstanding its knowledge, or willful blindness thereto, that the activities it induces result in infringement of the '067 patent. Defendant is aware that the Accused Instrumentalities are manufactured to comply with IEEE 802.11ac, and that the subsequent sale, offer for sale, and use of the Wi-Fi capabilities of such devices in the United States would result in direct infringement of at least claim 38 of the '067 patent. On information and belief, the Wi-Fi capabilities of the Accused Instrumentalities cannot be operated in their normal and customary way without complying with IEEE 802.11ac. Therefore, Defendant is aware that at least the end-users of its Accused Instrumentalities will infringe the '067 patent by using the Wi-Fi capabilities of those devices in their ordinary and customary way in accordance with IEEE 802.11ac. Defendant is also aware that dealerships that

offer for sale and sell the Accused Instrumentalities will infringe the ’067 patent via such offers for sale and sales.

71. Defendant has also indirectly infringed and continues to indirectly infringe at least claim 38 of the ’067 patent under 35 U.S.C. § 271(c), either literally and/or under the doctrine of equivalents, by contributing to the infringement of the ’067 patent by others.

72. Despite having knowledge of the ’067 Patent, Defendant has provided the Accused Instrumentalities to others (e.g., end users and dealerships), knowing that the Accused Instrumentalities include proprietary hardware components and software instructions that work in concert to perform specific, intended functions. Such specific intended functions, carried out by these hardware and software combinations, are a material part of the inventions of the ’067 patent and are not staple articles of commerce suitable for substantial non-infringing use.

73. Defendant has been on notice of the ’067 patent since at least as early as the receipt of the Notice Letters. Additionally, Defendant has been on notice of the ’067 patent since at least as early as the service of this Original Complaint. Defendant’s continued actions of making, using, selling, offering for sale, and/or importing into the United States any of the Accused Instrumentalities after receiving the Notice Letters and/or service of the Complaint, have been with Defendant’s knowledge of the ’067 patent, knowledge of infringement of the ’067 patent, intent to encourage others to infringe the ’067 patent through sale, offer for sale, and use of the Accused Instrumentalities, knowledge that Defendant’s encouraging acts actually result in direct infringement of the ’067 patent by others in the United States, and knowledge that Defendant’s actions contribute to the direct infringement of the ’067 patent by others in the United States.

74. Defendant’s infringement of the ’067 patent has been and continues to be deliberate and with willful disregard of the ’067 patent.

75. Sol IP does not accuse of infringement of the ’067 patent any products to the extent their relevant Wi-Fi functionality is implemented using Wi-Fi devices, modules, chipsets, or other components made, supplied, or sold by either LG Electronics Inc. and its subsidiaries or Samsung Electronics Co., Ltd. and its subsidiaries.

## COUNT TWO
## INFRINGEMENT OF U.S. PATENT NO. 10,090,894

76. Sol IP realleges and incorporates each of preceding paragraphs.

77. On October 2, 2018, the United States Patent and Trademark Office duly and legally issued the ’894 patent, titled “Method And Apparatus For Transceiving Data In A Mimo System.” A true and correct copy of the ’894 patent is attached as Exhibit 2.

78. Sol IP is the exclusive licensee of the ’894 patent and holds all substantial rights to that patent, including the sole right to sue and recover for any and all infringements.

79. The ’894 patent is valid and enforceable.

80. Defendant directly infringes one or more claims of the ’894 patent in this District and elsewhere in Texas and the United States.

81. Defendant directly infringes, either by itself or via its agent(s), alter egos, intermediaries, distributors, importers, and/or subsidiaries, at least claim 7 of the ’894 patent as set forth under 35 U.S.C. § 271(a) by making, using, selling, offering to sell, and/or importing the Accused Instrumentalities.

82. On information and belief, Defendant sold and made at least some of the Accused Instrumentalities outside of the United States, delivered those products to its customers, agents, intermediaries, distributors, importers, and/or subsidiaries in the United States, or in the case that it delivered the Accused Instrumentalities outside of the United States it did so intending and/or knowing that those products were destined for the United States and/or designed those products

for sale in the United States, thereby directly infringing the ’894 patent. *See, e.g.*, *Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013); *see also Semcon IP Inc. v. Kyocera Corp.*, No. 2:18-CV-00197-JRG, 2019 U.S. Dist. LEXIS 74904, at 6-8* (E.D. Tex. May 3, 2019). Furthermore, Defendant directly infringed the ’894 patent through its direct involvement in the activities of its subsidiaries including by selling and offering for sale the Accused Instrumentalities directly to such subsidiaries and importing the Accused Instrumentalities into the United States for such subsidiaries. Such subsidiaries conduct activities that constitute direct infringement of the ’894 patent under 35 U.S.C. § 271(a) by having made, used, tested, offered for sale, sold, and/or imported those Accused Instrumentalities. On information and belief, Defendant offered for sale, sold, and imported the Accused Products within the U.S. to, for example, its distributors, customers, subsidiaries, importers, and/or consumers. Further, Defendant is vicariously liable for this infringing conduct of its U.S.-based subsidiaries, (under both the alter ego and agency theories) because, as an example and on information and belief, Defendant and its subsidiaries are essentially the same company, and Defendant has the right and ability to control its subsidiaries infringing acts and receives a direct financial benefit from the infringement of its U.S.-based subsidiaries.

83. The preamble of claim 7 of the ’894 patent recites “[a]n apparatus.” To the extent the preamble limits the claim, each Accused Instrumentality is an apparatus.

84. Claim 7 of the ’894 patent recites “a memory.” Each Accused Instrumentality includes one or more memories.

85. Claim 7 of the ’894 patent recites “a processor operably coupled to the memory.” Each Accused Instrumentality includes one or more processors operably coupled to the one or

more memories, wherein the one or more processors are configured to implement at least the mandatory features of IEEE 802.11ac referenced in this Count.

86. Claim 7 of the ’894 patent recites that the processor is configured to “cause the apparatus to generate a Very High Throughput-Signal A (VHT-SIG A) field.” As recited in claim 7 of the ’894 patent and in accordance with at least IEEE 802.11ac, Sections 21.3.2 and 21.3.4.5, each Accused Instrumentality includes one or more processors configured to cause the apparatus to generate a very high-throughput signal A (VHT-SIG A) field. *See, e.g.*, IEEE 802.11-2016 §§ 21.3.2, 21.3.4, Figure 21-4, Table 21-4.

87. Claim 7 of the ’894 patent recites that the processor is configured to “cause the apparatus to generate a Very High Throughput-Signal B (VHT-SIG B) field.” As recited in claim 7 of the ’894 patent and in accordance with at least IEEE 802.11ac, Sections 21.3.2 and 21.3.4.8, each Accused Instrumentality includes one or more processors configured to cause the apparatus to generate a very high-throughput signal B (VHT-SIG B) field. *See, e.g.*, IEEE 802.11-2016 §§ 21.3.2, 21.3.4, Figure 21-4, Table 21-4.

88. Claim 7 of the ’894 patent recites that the processor is configured to “cause the apparatus to generate a service field.” As recited in claim 7 of the ’894 patent and in accordance with at least IEEE 802.11ac, Sections 21.3.2 and 21.3.10.2, each Accused Instrumentality includes one or more processors configured to cause the apparatus to generate a service field. *See, e.g.*, IEEE 802.11-2016 §§ 21.3.2, 21.3.10, Figure 21-4, Tables 21-4, 21-16.

89. Claim 7 of the ’894 patent recites that the processor is configured to “cause the apparatus to generate a data unit.” As recited in claim 7 of the ’894 patent and in accordance with at least IEEE 802.11ac, Sections 21.3.2 and 21.3.4.9, each Accused Instrumentality includes one

or more processors configured to cause the apparatus to generate a physical layer service data unit (PSDU). *See, e.g.*, IEEE 802.11-2016 §§ 21.3.2, 21.3.4, Figure 21-4, Table 21-4.

90. Claim 7 of the '894 patent recites that the processor is configured to "cause the apparatus to transmit the VHT-SIG A field." As recited in claim 7 of the '894 patent and in accordance with at least IEEE 802.11ac, Section 21.3.19, each Accused Instrumentality includes one or more processors configured to cause the apparatus to transmit the VHT-SIG A field. *See, e.g.*, IEEE 802.11-2016 § 21.3.19, Figures 21-4, 21-34, Table 21-4.

91. Claim 7 of the '894 patent recites that the processor is configured to "cause the apparatus to transmit a training field after transmitting the VHT-SIG A field." As recited in claim 7 of the '894 patent and in accordance with at least IEEE 802.11ac, Section 21.3.19, each Accused Instrumentality includes one or more processors configured to cause the apparatus to transmit very high-throughput (VHT) training symbols comprising VHT short training field and VHT long training field after transmitting the VHT-SIG A field. *See, e.g.*, IEEE 802.11-2016 § 21.3.19, Figures 21-4, 21-34, Table 21-4.

92. Claim 7 of the '894 patent recites that the processor is configured to "cause the apparatus to transmit the VHT-SIG B field after transmitting the training field." As recited in claim 7 of the '894 patent and in accordance with at least IEEE 802.11ac, Section 21.3.19, each Accused Instrumentality includes one or more processors configured to cause the apparatus to transmit the VHT-SIG B field after transmitting the VHT training symbols. *See, e.g.*, IEEE 802.11-2016 § 21.3.19, Figures 21-4, 21-34, Table 21-4.

93. Claim 7 of the '894 patent recites that the processor is configured to "cause the apparatus to transmit the service field after transmitting the VHT-SIG B field." As recited in claim 7 of the '894 patent and in accordance with at least IEEE 802.11ac, Section 21.3.19, each Accused

Instrumentality includes one or more processors configured to cause the apparatus to transmit the service field after transmitting the VHT-SIG B field. *See, e.g.*, IEEE 802.11-2016 § 21.3.19, Figures 21-4, 21-34, Table 21-4.

94. Claim 7 of the ’894 patent recites that the processor is configured to “cause the apparatus to transmit the data unit after transmitting the service field, wherein: the VHT-SIG B field includes bits relating to a length of the data unit and tail bits; and the service field comprises bits relating to a scrambler and cyclic redundancy check (CRC) bits.” As recited in claim 7 of the ’894 patent and in accordance with at least IEEE 802.11ac, Sections 21.3.19, 21.3.8.3.6, and 21.3.10, each Accused Instrumentality includes one or more processors configured to cause the apparatus to transmit the PSDU after transmitting the VHT-SIG B field. *See, e.g.*, IEEE 802.11-2016 §§ 21.3.8, 21.3.10, 21.3.19, Figures 21-4, 21-34, 21-22, 21-23, 9-741, Tables 21-4, 21-14, 21-16. As recited in claim 7 of the ’894 patent and in accordance with at least IEEE 802.11ac, Sections 21.3.8.3.6, 21.4.3, and 10.13.6, the VHT-SIG B field includes a VHT-SIG B length field with bits relating to the length of the PSDU and a tail field with tail bits. *See, e.g.*, IEEE 802.11-2016 §§ 21.3.8, 21.4.3, 10.13.6, Figures 21-22, 9-741, 21-34, Table 21-14. As recited in claim 7 of the ’894 patent and in accordance with at least IEEE 802.11ac, Sections 21.3.10.2 and 21.3.10.3, the service field comprises a scrambler initialization field with bits relating to a scrambler and a cyclic redundancy check (CRC) field with CRC bits. *See, e.g.*, IEEE 802.11-2016 § 21.3.10, Figure 21-23, Table 21-16.

95. Defendant has indirectly infringed and continues to indirectly infringe at least claim 7 of the ’894 patent under 35 U.S.C. § 271(b), either literally and/or under the doctrine of equivalents, by actively inducing others, including OEMs, agent-subsidiaries, affiliates, partners, software and hardware providers, manufacturers, system integrators, distributors, importers,

resellers, customers, end users, and/or other third parties, in this district and elsewhere in the United States, to directly infringe the ’894 patent.

96. Defendant indirectly infringes by inducing third parties (e.g., end users) to infringe at least claim 7 of the ’894 patent by using the Wi-Fi capabilities of the Accused Instrumentalities in their normal and customary way (e.g., activating the Wi-Fi hotspot, connecting Wireless Apple CarPlay and/or Wireless Android Auto, over-the-air system updates via Wi-Fi) in the United States and in this district. Defendant also indirectly infringes by inducing third parties (e.g., dealerships, to the extent they are not deemed to be Defendant’s agents) to infringe at least claim 7 of the ’894 patent by offering for sale and selling the Accused Instrumentalities. For example, Defendant actively induces third parties, including without limitation end-users of the Accused Instrumentalities and dealerships (to the extent not agents of Defendant) that sell and offer to sell the Accused Instrumentalities, to infringe the ’894 patent by, among other things, (i) designing, manufacturing, offering for sale, selling, or otherwise providing the Accused Instrumentalities to third parties (e.g., dealerships, to the extent they are not deemed to be Defendant’s agents) with the knowledge and intent that the third parties will sell the Accused Instrumentalities to end users; (ii) designing and manufacturing the Accused Instrumentalities with the knowledge and intent that end-users will use the Wi-Fi capabilities of such devices in accordance with at least IEEE 802.11ac; (iii) enabling end-users of Accused Instrumentalities to use the devices in accordance with at least IEEE 802.11ac; (iv) providing instructions to end-users for using the Accused Instrumentalities in their customary way, including instructions on using the Wi-Fi connectivity features of the devices; (v) enabling users to monitor and control their Accused Instrumentalities using Defendant’s Mobile App; and (vi) providing to third parties the hardware components (e.g., antenna(s), filter(s), switch(es), transceiver(s), and/or baseband processor(s) contained in Accused

Instrumentalities) and software components (e.g., operating systems running on Accused Instrumentalities and other software and/or firmware used to operate components of the Accused Instrumentalities) that may be required for or associated with infringement of the ’894 patent.

97. Defendant encourages end-users and dealerships to infringe at least claim 7 of the ’894 patent with knowledge and the specific intent to cause the acts of direct infringement performed by these third parties. On information and belief, despite having knowledge of the ’894 patent at least as early as the receipt of the Notice Letters, Defendant has engaged and continues to engage in activities constituting inducement of such direct infringement, notwithstanding its knowledge, or willful blindness thereto, that the activities it induces result in infringement of the ’894 patent. Defendant is aware that the Accused Instrumentalities are manufactured to comply with IEEE 802.11ac, and that the subsequent sale, offer for sale, and use of the Wi-Fi capabilities of such devices in the United States would result in direct infringement of at least claim 7 of the ’894 patent. On information and belief, the Wi-Fi capabilities of the Accused Instrumentalities cannot be operated in their normal and customary way (e.g., activating the Wi-Fi hotspot, connecting Wireless Apple CarPlay and/or Wireless Android Auto, over-the-air system updates via Wi-Fi) without complying with IEEE 802.11ac and infringement of at least claim 7 of the ’894 patent. Therefore, Defendant is aware that at least the end-users of its Accused Instrumentalities will infringe the ’894 patent by using the Wi-Fi capabilities of those devices in their ordinary and customary way (e.g., activating the Wi-Fi hotspot, connecting Wireless Apple CarPlay and/or Wireless Android Auto, over-the-air system updates via Wi-Fi) in accordance with at least claim 7 of the ’894 patent and the relevant portions of IEEE 802.11ac. Defendant is also aware that dealerships that offer for sale and sell the Accused Instrumentalities will infringe the ’894 patent via such offers for sale and sales.

98. Defendant has also indirectly infringed and continues to indirectly infringe at least claim 7 of the ’894 patent under 35 U.S.C. § 271(c), either literally and/or under the doctrine of equivalents, by contributing to the infringement of the ’894 patent by others.

99. Despite having knowledge of the ’894 Patent, Defendant has provided the Accused Instrumentalities to others (e.g., end users and dealerships), knowing that the Accused Instrumentalities include proprietary hardware components and software instructions that work in concert to perform specific, intended functions. Such specific intended functions, carried out by these hardware and software combinations, are a material part of the inventions of the ’894 patent and are not staple articles of commerce suitable for substantial non-infringing use.

100. Defendant has been on notice of the ’894 patent since at least as early as the receipt of the Notice Letters. Additionally, Defendant has been on notice of the ’894 patent since at least as early as the service of this Original Complaint. Defendant’s continued actions of making, using, selling, offering for sale, and/or importing into the United States any of the Accused Instrumentalities after receiving the Notice Letters and/or service of the Complaint, have been with Defendant’s knowledge of the ’894 patent, knowledge of infringement of the ’894 patent, intent to encourage others to infringe the ’894 patent through sale, offer for sale, and use of the Accused Instrumentalities, knowledge that Defendant’s encouraging acts actually result in direct infringement of the ’894 patent by others in the United States, and knowledge that Defendant’s actions contribute to the direct infringement of the ’894 patent by others in the United States.

101. Defendant’s infringement of the ’894 patent has been and continues to be deliberate and with willful disregard of the ’894 patent.

102. Sol IP does not accuse of infringement of the ’894 patent any products to the extent their relevant Wi-Fi functionality is implemented using Wi-Fi devices, modules, chipsets, or other

components made, supplied, or sold by either LG Electronics Inc. and its subsidiaries or Samsung Electronics Co., Ltd. and its subsidiaries.

## DEMAND FOR TRIAL BY JURY

103. Sol IP respectfully requests a trial by jury on all issues so triable in accordance with Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

104. WHEREFORE, Sol IP respectfully requests that the Court enter judgment in its favor on the claims set forth above and respectfully requests the following relief:

a) Entry of judgment that Defendant has directly and/or indirectly infringed the Asserted Patents, and continues to do so;

b) Entry of judgment against Defendant, awarding Sol IP damages adequate to compensate Sol IP for Defendant's direct and/or indirect infringement of the Asserted Patents, and for any continuing or future infringement through the date such judgment is entered, including pre-judgment interest and post-judgment interest, costs, and expenses, as well as an accounting and award of damages against Defendant for all future infringing acts occurring after the date such judgment is entered;

c) Entry of judgment that Defendant's direct and/or indirect infringement of the Asserted Patents has been and continues to be willful;

d) Entry of judgment as provided by 35 U.S.C. § 284 for an award of treble damages against Defendant for its willful direct and/or indirect infringement of the Asserted Patents;

e) A permanent injunction enjoining Defendant and its officers, agents, representatives, assigns, licensees, distributors, employees, related entities, and those

acting in privity or in concert with Defendant from further infringement of the Asserted Patents;

f) Entry of judgment as provided by 35 U.S.C. § 285 that this case is exceptional and an award granting Sol IP its reasonable attorneys' fees, expenses, and costs; and

g) Entry of judgment in favor of Sol IP granting any further or additional relief the Court deems just and proper.

Dated: August 28, 2026

Respectfully submitted,

*/s/ Brent N. Bumgardner*
Brent N. Bumgardner
State Bar No. 00795272
brent@nelbum.com
Christopher G. Granaghan
State Bar No. 24078585
chris@nelbum.com
John P. Murphy
State Bar No. 24056024
murphy@nelbum.com
Janson H. Westmoreland
Texas Bar. No. 24131755
janson@nelbum.com
**NELSON BUMGARDNER CONROY PC**
3131 West 7th Street, Suite 300
Fort Worth, Texas 76107
817.377.9111

Timothy E. Grochocinski
Illinois Bar No. 6295055
tim@nelbum.com
Taryn N. Trusty
Illinois Bar No. 6344409
**NELSON BUMGARDNER CONROY PC**
745 McClintock Drive
Suite 340
Burr Ridge, Illinois 60527
708.675.1974

*Counsel for*
*Plaintiff Sol IP, LLC*